[L.A. No. 30650. May 6, 1977.]

ANN MARIE BORER, a Minor, etc., et al., Plaintiffs and Appellants, v. AMERICAN AIRLINES, INC., Defendant and Respondent.

## COUNSEL

John H. Russell and Sarrail & Russell for Plaintiffs and Appellants.

Brill, Hunt, DeBuys & Burby, Stuart E. Rissman, Michael T. Fox and Ellis J. Horvitz for Defendant and Respondent.

## OPINION

**TOBRINER, Acting C. J.**—In *Rodriguez* v. *Bethlehem Steel Corp.* (1974) 12 Cal.3d 382 [115 Cal.Rptr. 765, 525 P.2d 669], we held that a married person whose spouse had been injured by the negligence of a third party may maintain a cause of action for loss of "consortium." We defined loss of "consortium" as the "loss of conjugal fellowship and sexual relations" (12 Cal.3d at p. 385), but ruled that the term included the loss of love, companionship, society, sexual relations, and household services. Our decision carefully avoided resolution of the question whether anyone

other than the spouse of a negligently injured person, such as a child or a parent, could maintain a cause of action analogous to that upheld in *Rodriguez*. We face that issue today: the present case presents a claim by nine children for the loss of the services, companionship, affection and guidance of their mother; the companion case of *Baxter* v. *Superior Court, post,* page 461 [138 Cal.Rptr. 315, 563 P.2d 871] presents the claim of a mother and father for the loss of the companionship and affection of their 16-year-old son.

Claims for loss of consortium of parents or of children have come before our Courts of Appeal on four occasions since the date of the filing of *Rodriguez*. Two decisions have held that a child has no cause of action for loss of parental consortium. (*Garza* v. *Kantor* (1976) 54 Cal.App.3d 1025 [127 Cal.Rptr. 164]; *Suter* v. *Leonard* (1975) 45 Cal.App.3d 744 [120 Cal.Rptr. 110].) Two other cases have said that a parent can state a cause of action for loss of a child's consortium. (*Mobaldi* v. *Regents of University of California* (1976) 55 Cal.App.3d 573, 586 [127 Cal.Rptr. 720]; *Hair* v. *County of Monterey* (1975) 45 Cal.App.3d 538, 545 [119 Cal.Rptr. 639] (dictum).) Unpersuaded of any legal distinction between a parent's claim for loss of a child's consortium and a child's claim for loss of a parent's consortium, we granted hearings in the instant case and in *Baxter* v. *Superior Court* in order to address generally the question whether to recognize a new cause of action for loss of consortium in a parent-child relationship.

 Judicial recognition of a cause of action for loss of consortium, we believe, must be narrowly circumscribed. Loss of consortium is an intangible injury for which money damages do not afford an accurate measure or suitable recompense; recognition of a right to recover for such losses in the present context, moreover, may substantially increase the number of claims asserted in ordinary accident cases, the expense of settling or resolving such claims, and the ultimate liability of the defendants. Taking these considerations into account, we shall explain why we have concluded that the payment of damages to persons for the lost affection and society of a parent or child neither truly compensates for such loss nor justifies the social cost in attempting to do so. We perceive significant differences between the marital relationship and the parent-child relationship that support the limitation of a cause of action for loss of consortium to the marital situation; we shall therefore further elaborate our reasons for concluding that a child cannot maintain a cause of action for loss of parental consortium. In similar fashion we conclude in the companion case of *Baxter* v. *Superior Court* that a parent cannot maintain a cause of action for loss of a child's consortium.

Finally, we shall explain why we reject plaintiffs' argument that because children can recover in a wrongful death action for the loss of the affection and society of their deceased parent, a denial of plaintiffs' cause of action for the loss of consortium of their injured parent would deprive them of the equal protection of the laws.

■ Since this appeal arises following a trial court order sustaining a demurrer to plaintiffs' complaint without leave to amend, we focus first on the specific allegations of plaintiffs' complaint. Plaintiffs, the nine children of Patricia Borer, allege that on March 21, 1972, the cover on a lighting fixture at the American Airlines Terminal at Kennedy Airport fell and struck Patricia. Plaintiffs further assert that as a result of the physical injuries sustained by Patricia, each of them has been "deprived of the services, society, companionship, affection, tutelage, direction, guidance, instruction and aid in personality development, all with its accompanying psychological, educational and emotional detriment, by reason of Patricia Borer being unable to carry on her usual duties of a mother." The complaint sets forth causes of action based upon negligence, breach of warranty, and manufacture of a defective product; it names as defendants American Airlines, two companies which manufactured and assembled the lighting fixture, and various fictitious defendants. Each plaintiff seeks damages of $100,000.

Defendant American Airlines demurred to the complaint for failure to state a cause of action. (Code Civ. Proc., § 430.10, subd. (e).) The trial court sustained the demurrer without leave to amend, and entered judgment dismissing the suit as to defendant American Airlines. Plaintiffs appealed from that judgment.

■ Our analysis of plaintiffs' appeal begins with our decision in *Rodriguez* v. *Bethlehem Steel Corp., supra,* 12 Cal.3d 382. In holding that a spouse has a cause of action for loss of consortium, we considered the proffered argument that such a holding would logically require us to uphold an analogous cause of action in the parent-child context or in even more distant relationships; we rejected that contention.

Quoting decisions of other states on the above point, we stated on pages 403-404 that "Recognizing the traditional power of the courts to control the development of a judge-made rule of law, the court in *Diaz* v. *Eli Lilly and Company* (1973) *supra,* [364 Mass. 153] 302 N.E.2d 555, 563, stated: 'Nor does it follow that if the husband-wife relationship is protected as here envisaged, identical protection must be afforded by analogy to other relationships from that of parent-child in a lengthy regress to that of

master-servant; courts will rather proceed from case to case with discerning caution.' (Fn. omitted.) [¶] Dismissing the same argument, the New Jersey court stated that 'The law has always been most solicitous of the husband and wife relationship, perhaps more so than the parent and child relationship. [Citation.] In any event, policy rather than logic is the determinative factor and, while persuasive arguments may be mustered in favor of the child's claim (Prosser, supra, at p. 919), the reciprocal recognition of the wife's claim may readily be rested on its own footing of equality and justice without any compulsion of going further.' (*Ekalo* v. *Constructive Serv. Corp. of Am* (1965) *supra,* [46 N.J. 82] 215 A.2d 1, 7.)"

*Rodriguez,* thus, does not compel the conclusion that foreseeable injury to a legally recognized relationship necessarily postulates a cause of action; instead it clearly warns that social policy must at some point intervene to delimit liability. Patricia Borer, for example, foreseeably has not only a husband (who has a cause of action under *Rodriguez*) and the children who sue here, but also parents whose right of action depends upon our decision in the companion case of *Baxter* v. *Superior Court*; foreseeably, likewise, she has brothers, sisters, cousins, inlaws, friends, colleagues, and other acquaintances who will be deprived of her companionship. No one suggests that all such persons possess a right of action for loss of Patricia's consortium; all agree that somewhere a line must be drawn. As stated by Judge Breitel in *Tobin* v. *Grossman* (1969) 24 N.Y.2d 609, 619 [301 N.Y.S.2d 554, 249 N.E.2d 419]; "Every injury has ramifying consequences, like the ripplings of the waters, without end. The problem for the law is to limit the legal consequences of wrongs to a controllable degree."

. The decision whether to limit liability for loss of consortium by denying a cause of action in the parent-child context, or to permit that action but deny any claim based upon more remote relationships, is thus a question of policy. As explained by Justice Fleming in *Suter* v. *Leonard* (1975) 45 Cal.App.3d 744, 746 [120 Cal.Rptr. 110]: "Plaintiff's claim, viewed in the abstract and divorced from its surroundings, carries both logical and sympathetic appeal. . . . Certain aspects of spousal relationship are similar to those of the parent-child relationship, and there can be little question of the reality of the loss suffered by a child deprived of the society and care of its parent. Nevertheless our decision must take *into account considerations in addition to logical symmetry and sympathetic appeal.* . . . [N]ot every loss can be made compensable in money damages, and legal causation must terminate somewhere. In delineating the extent of a tortfeasor's responsibility for damages under the general rule of tort liability (Civ. Code, § 1714), the courts must

locate the line between liability and nonliability at some point, a decision which is essentially political."

In the first instance, strong policy reasons argue against extension of liability to loss of consortium of the parent-child relationship. Loss of consortium is an intangible, nonpecuniary loss; monetary compensation will not enable plaintiffs to regain the companionship and guidance of a mother; it will simply establish a fund so that upon reaching adulthood, when plaintiffs will be less in need of maternal guidance, they will be unusually wealthy men and women. To say that plaintiffs have been "compensated" for their loss is superficial; in reality they have suffered a loss for which they can never be compensated; they have obtained, instead, a future benefit essentially unrelated to that loss.

We cannot ignore the social burden of providing damages for loss of parental consortium merely because the money to pay such awards comes initially from the "negligent" defendant or his insurer. Realistically the burden of payment of awards for loss of consortium must be borne by the public generally in increased insurance premiums or, otherwise, in the enhanced danger that accrues from the greater number of people who may choose to go without any insurance. We must also take into account the cost of administration of a system to determine and pay consortium awards; since virtually every serious injury to a parent would engender a claim for loss of consortium on behalf of each of his or her children, the expense of settling or litigating such claims would be sizable.

Plaintiffs point out that courts have permitted recovery of monetary damages for intangible loss in allowing awards for pain and suffering in negligence cases and in sanctioning recovery for loss of marital consortium. The question before us in this case, however, pivots on whether we should recognize a wholly new cause of action, unsupported by statute or precedent; in this context the inadequacy of monetary damages to make whole the loss suffered, considered in light of the social cost of paying such awards, constitutes a strong reason for refusing to recognize the asserted claim. To avoid misunderstanding, we point out that our decision to refuse to recognize a cause of action for parental consortium does not remotely suggest the rejection of recovery for intangible loss; each claim must be judged on its own merits, and in many cases the involved statutes, precedents, or policy will induce acceptance of the asserted cause of action.

A second reason for rejecting a cause of action for loss of parental consortium is that, because of its intangible character, damages for such a loss are very difficult to measure. Plaintiffs here have prayed for $100,000 each; yet by what standard could we determine that an award of $10,000 was inadequate, or one of $500,000 excessive? Difficulty in defining and quantifying damages leads in turn to risk of double recovery: to ask the jury, even under carefully drafted instructions, to distinguish the loss to the mother from her inability to care for her children from the loss to the children from the mother's inability to care for them may be asking too much. Thus as observed by the New Jersey Supreme Court in *Russell* v. *Salem Transportation Company* (1972) 61 N.J. 502 [295 A.2d 862, 864, 69 A.L.R.3d 522]: "The asserted social need for the disputed cause of action [a child's action for loss of parental consortium] may well be qualified, at least in terms of the family as an economic unit, by the practical consideration recognized by many of the cases on the point that reflection of the consequential disadvantages to children of injured parents is frequently found in jury awards to the parents on their own claims under existing law and practice."

Plaintiffs point out that similar policy arguments could be, and to some extent were, raised in *Rodriguez,* and that our decision to uphold the wife's action for loss of consortium rejected those arguments. We do not, however, read *Rodriguez* as holding that arguments based upon the intangible character of damages and the difficulty of measuring such damages do not merit consideration. Such a holding would imply an indefinite extension of liability for loss of consortium to all foreseeable relationships, a proposition *Rodriguez* plainly repudiates.

*Rodriguez,* then, holds no more than that in the context of a spousal relationship, the policy arguments against liability do not suffice to justify a holding denying a cause of action. Plaintiffs contend, however, that no adequate ground exists to distinguish a cause of action for loss of spousal consortium from one for loss of parental consortium. We reject the contention for three reasons.

First, as *Rodriguez* pointed out, the spousal action for loss of consortium rests in large part on the "impairment or destruction of the sexual life of the couple." (12 Cal.3d 382, 405.) No similar element of damage appears in a child's suit for loss of consortium.

Second, actions by children for loss of parental consortium create problems of multiplication of actions and damages not present in the

spousal context. As pointed out by the New Jersey Supreme Court in *Russell* v. *Salem Transportation Company, supra,* 295 A.2d 862, 864:

"If the claim were allowed there would be a substantial accretion of liability against the tortfeasor arising out of a single transaction (typically the negligent operation of an automobile). Whereas the assertion of a spouse's demand for loss of consortium involves the joining of only a single companion claim in the action with that of the injured person, the right here debated would entail adding as many companion claims as the injured parent had minor children, each such claim entitled to separate appraisal and award. The defendant's burden would be further enlarged if the claims were founded upon injuries to both parents. Magnification of damage awards to a single family derived from a single accident might well become a serious problem to a particular defendant as well as in terms of the total cost of such enhanced awards to the insured community as a whole."

The instant case illustrates the point. Patricia Borer has nine children, each of whom would possess his own independent right of action for loss of consortium. Even in the context of a consolidated action, the assertion of nine independent causes of action for the children in addition to the father's claim for loss of consortium and the mother's suit for ordinary tort damages, demonstrates the extent to which recognition of plaintiffs' asserted cause of action will multiply the tort liability of the defendant.

Finally, the proposition that a spouse has a cause of action for loss of consortium, but that a child does not, finds overwhelming approval in the decisions of other jurisdictions. Over 30 states, a clear majority of those who have decided the question, now permit a *spousal* suit for loss of consortium.[1] *No* state permits a child to sue for loss of parental consortium. That claim has been presented, at latest count, to 18 jurisdictions, and rejected by all of them.[2]

[1] See listing in Love, *Tortious Interference with the Parent-Child Relationship: Loss of an Injured Person's Society and Companionship* (1976) 51 Ind. L.J. 590, 596 footnote 20.

[2] The California Court of Appeal decisions that reject a child's suit for loss of parental consortium are *Garza* v. *Kantor, supra,* 54 Cal.App.3d 1025 and *Suter* v. *Leonard, supra,* 45 Cal.App.3d 744. Decisions of other jurisdictions include: *Pleasant* v. *Washington Sand & Gravel Co.* (D.C. Cir. 1958) 262 F.2d 471 [104 App.D.C. 374]; *Early* v. *United States* (9th Cir. 1973) 474 F.2d 756 (Alaska law); *Jeune* v. *Del E. Webb Constr. Co.* (1954) 77 Ariz. 226 [269 P.2d 723]; *Turner* v. *Atlantic Coast Line R. Co.* (D. Ga. 1958) 159 F. Supp. 590 (South Carolina law); *Halberg* v. *Young* (1957) 41 Hawaii 634 [59 A.L.R.2d 445]; *Hankins* v. *Derby* (Iowa 1973) 211 N.W.2d 581; *Hoffman* v. *Dautel* (1962) 189 Kan. 165 [368 P.2d 57]; *Sabatier* v. *Travelers Ins. Co.* (La.App. 1966) 184 So.2d 594; *Feneff* v. *New York C. & H.R.R. Co.* (1909) 203 Mass. 278 [89 N.E. 436]; *Hayrynen* v. *White Pine*

We reject, finally, plaintiffs' claim that denial of a cause of action for loss of parental consortium is inconsistent with the principles of tort law laid down in prior decisions of this court. Plaintiffs refer to *Rowland* v. *Christian* (1968) 69 Cal.2d 108, 113 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496], which stated some of the considerations to be balanced in deciding whether to deny a cause of action for injury resulting from negligence, and to *Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425, 434 [131 Cal.Rptr. 14, 551 P.2d 334], which stated that the most important of these considerations was foreseeability. Neither *Rowland* nor *Tarasoff,* however, involved the creation of a new cause of action for solely intangible damages, attended with problems of multiplication of claims and liability. These considerations, which were not presented or considered in the prior cases, form the basis of our conclusion that we should reject plaintiffs' claim.

Plaintiffs place particular emphasis on *Dillon* v. *Legg* (1968) 68 Cal.2d 728 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316], which upheld a cause of action for injuries flowing from a mother's emotional trauma in witnessing the death of her child. We suggested that the cause of action should be sustained whenever the injury was "reasonably foreseeable" (p. 741), and that one factor to be considered was "whether plaintiff and the victim were closely related." (*Ibid.*) Plaintiffs urge that we follow that paradigm for decision of the instant case.

In *Dillon,* however, we carefully limited our ruling to a case in which the plaintiff suffered physical injury. (68 Cal.2d at p. 740.) Subsequent decisions, interpreting our holding in *Dillon,* have refused to recognize a cause of action in a case in which the plaintiff suffered no physical injury himself as a result of witnessing the infliction of injury upon a family member. (See *Krouse* v. *Graham, ante,* p. 59 at pp. 77-78 [137 Cal.Rptr. 863, 562 P.2d 1022]; *Capelouto* v. *Kaiser Foundation Hospitals* (1972) 7 Cal.3d 889, 892 fn. 1 [103 Cal.Rptr. 856, 500 P.2d 880]; *Hair* v. *County of Monterey, supra,* 45 Cal.App.3d 538, 542.) Thus *Dillon* and subsequent authority support our decision in this case to deny a cause of action founded upon purely intangible injury.

*Copper Co.* (1968) 9 Mich.App. 452 [157 N.W.2d 502]; *Miller* v. *Monsen* (1949) 228 Minn. 400 [37 N.W.2d 543]; *Stout* v. *Kansas City Terminal R. Co.* (1913) 172 Mo.App. 113 [157 S.W. 1019]; *General Electric Co.* v. *Bush* (1972) 88 Nev. 360 [498 P.2d 366]; *Russell* v. *Salem Transportation Co.* (1972) 61 N.J. 502 [295 A.2d 862, 69 A.L.R.3d 522]; *Duhan* v. *Milanowski* (1973) 75 Misc.2d 1078 [348 N.Y.S.2d 696]; *Gibson* v. *Johnston* (1956) 75 Ohio L.Abs. 413 [144 N.E.2d 310]; *Erhardt* v. *Havens, Inc.* (1958) 53 Wn.2d 103 [330 P.2d 1010]; see generally Annot. (1969) 69 A.L.R.3d 528.

We therefore conclude that we should not recognize a cause of action by a child for loss of parental consortium.[3] **(3)** Plaintiffs contend, however, that such a conclusion would distinguish between the rights of the child in the present context and the rights afforded him in a wrongful death action, without any rational basis for the distinction in contravention of the equal protection of the laws.

Plaintiffs point out that section 377 of the Code of Civil Procedure authorizes an action for wrongful death by the heirs of the victim; judicial decisions interpreting this section permit recovery by children of the value of the deceased's affection and society. (See *Krouse* v. *Graham, supra, ante,* at pp. 67-68 and cases there cited.) Plaintiffs contend that no rational basis supports a ruling that permits the children of a deceased parent to recover the value of lost affection and companionship, but denies the children of a seriously disabled parent a similar cause of action.

Plaintiffs' contention in essence asserts that Code of Civil Procedure section 377 is unconstitutionally underinclusive; that the distinction it draws between the class of children whose parent suffers death and those whose parent suffers disability cannot constitutionally be supported. Our inquiry, consequently, condenses into the question whether the classification rests "upon some ground of difference having a fair and substantial relation to the object of the legislation." (*Reed* v. *Reed* (1971) 404 U.S. 71, 75-76 [30 L.Ed.2d 225, 229, 92 S.Ct. 251]; *Royster Guano Co.* v. *Virginia* (1920) 253 U.S. 412, 415 [64 L.Ed. 989, 990-991, 40 S.Ct. 560]; *Brown* v. *Merlo* (1973) 8 Cal.3d 855, 861 [106 Cal.Rptr. 388, 506 P.2d 212, 66 A.L.R.3d 505].)

We perceive two significant distinctions between the child whose parent is killed and one whose parent is disabled, both of which flow from the fact that in the latter case the living victim retains his or her own cause of action. The first distinction relates to the historical purpose of the wrongful death statutes. By 1846, the date of the enactment of the first wrongful death statute, the common law courts had settled that the heirs of a deceased victim could not bring a cause of action against the

---

[3]The considerations which lead us to reject a cause of action for negligent injury to consortium in a parent-child context do not bar an action for intentional interference with parental consortium. An action for intentional interference with consortium, recognized by precedent in California (see *Rosefield* v. *Rosefield* (1963) 221 Cal.App.2d 431 [34 Cal.Rptr. 479]) is a relatively unusual tort that presents no danger of multiplication of claims or damages. The ruling, moreover, may serve to deter child stealing and similar antisocial conduct.

tortfeasor. (See 1 Speiser, Recovery for Wrongful Death (2d ed. 1975) §§ 1.1, 1.2.) "The result was that it was more profitable for the defendant to kill the plaintiff than to scratch him, and that the most grievous of all injuries left the bereaved family of the victim, who frequently were destitute, without a remedy." (Prosser, Torts (4th ed. 1971) p. 902.) This loophole in the law curtailed the deterrent function of tort recovery, providing to tortfeasors a substantial incentive to finish off their victims. The wrongful death statutes thus met an obvious logical and social need.

Similar policy reasons led the courts to permit the bereaved to recover for the loss of the affection and society of the deceased. As stated in *Krouse* v. *Graham,* "if damages truly were limited to 'pecuniary' loss, recovery frequently would be barred by the heirs' inability to prove such loss. The services of children, elderly parents, or nonworking spouses often do not result in measurable net income to the family unit, yet unquestionably the death of such a person represents a substantial 'injury' to the family." (*Ante,* at p. 68.) Recovery for loss of affection and society in a wrongful death action thus fulfills a deeply felt social belief that a tortfeasor who negligently kills someone should not escape liability completely, no matter how unproductive his victim.

A suit for loss of consortium of a disabled parent presents a wholly different picture. Here the tortfeasor cannot escape with impunity, for the immediate victim of his tort retains a cause of action for the injuries inflicted. The claim by the child in this setting is not essential to prevent the tortfeasor from totally escaping liability.

Secondly, the wrongful death action serves as the only means by which the family unit can recover compensation for the loss of parental care and services in the case of the wrongful death of the parent. While the parent lives, however, "the tangible aspects of the child's loss can be compensated in the parent's *own* cause of action. As put by Stainback, J., in *Halberg* v. *Young, supra,* 41 Hawaii 634, 640. . ., 'where a parent has been injured by the negligent act of another the parent will recover from the other full damage which he has sustained, including such inability, if any, to properly care for his children, and thus the parent's ability to carry out his duty to support and maintain the child has not, in a legal sense, been destroyed or impaired by the injury to him.' " (*Suter* v. *Leonard, supra,* 45 Cal.App.3d 744, 748.)

We conclude that the distinction between the award of damages for loss of affection and society to a child whose parent has been tortiously killed, and the denial of such damages to a child whose parent has been

disabled, rests upon a rational basis. Plaintiffs' constitutional argument therefore fails.

In summary, we do not doubt the reality or the magnitude of the injury suffered by plaintiffs. We are keenly aware of the need of children for the love, affection, society and guidance of their parents; any injury which diminishes the ability of a parent to meet these needs is plainly a family tragedy, harming all members of that community. We conclude, however, that taking into account all considerations which bear on this question, including the inadequacy of monetary compensation to alleviate that tragedy, the difficulty of measuring damages, and the danger of imposing extended and disproportionate liability, we should not recognize a nonstatutory cause of action for the loss of parental consortium.

The judgment is affirmed.

Clark, J., Richardson, J., Sullivan, J.,* and Wright, J.,† concurred.

**MOSK, J.**—I dissent.

Each of the policy arguments which the majority marshal against recognizing the cause of action for loss of consortium in the parent-child relationship was expressly considered and rejected by this court in *Rodriguez* v. *Bethlehem Steel Corp.* (1974) 12 Cal.3d 382 [115 Cal.Rptr. 765, 525 P.2d 669].

First, the majority assert that because deprivation of consortium is an "intangible, nonpecuniary" loss, it is an injury which "can never be compensated." (*Ante,* p. 447.) In *Rodriguez,* however, we held that loss of consortium is principally a form of mental suffering, and like all such subjective disabilities, it is compensable in damages. (*Id.,* at p. 401.) Nor was this new law, as we showed by quoting with approval from earlier decisions of this court.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

†Retired Chief Justice of California sitting under assignment by the Acting Chairman of the Judicial Council.

Thus in *Beagle* v. *Vasold* (1966) 65 Cal.2d 166, 172 [53 Cal.Rptr. 129, 417 P.2d 673], we said that "One of the most difficult tasks imposed upon a jury in deciding a case involving personal injuries is to determine the amount of money the plaintiff is to be awarded as compensation for pain and suffering. No method is available to the jury by which it can objectively evaluate such damages, and no witness may express his subjective opinion on the matter. [Citation.] In a very real sense, the jury is asked to evaluate in terms of money a detriment for which monetary compensation cannot be ascertained with any demonstrable accuracy." "Yet," we emphasized in *Beagle* (at p. 176), "the inescapable fact is that this is precisely what the jury is called upon to do."

Again, in *Capelouto* v. *Kaiser Foundation Hospitals* (1972) 7 Cal.3d 889, 892-893 [103 Cal.Rptr. 856, 500 P.2d 880], Justice Tobriner wrote for a unanimous court that pain and suffering is a convenient label that includes not only physical pain, but also "fright, nervousness, grief, anxiety, worry, mortification, shock, humiliation, indignity, embarrassment, apprehension, terror or ordeal. [Citations.] Admittedly these terms refer to subjective states, representing a detriment which can be translated into monetary loss only with great difficulty. [Citations.] But the detriment, nevertheless, is a genuine one that requires compensation [citations], and the issue generally must be resolved by the 'impartial conscience and judgment of jurors who may be expected to act reasonably, intelligently and in harmony with the evidence.' [Citations.] [¶] Indeed, mental suffering frequently constitutes the principal element of tort damages (Rest.2d Torts, § 905, com. c); awards which fail to compensate for pain and suffering have been held inadequate as a matter of law. [Citations.]" I am utterly unable to reconcile this thorough statement of settled principles with the majority's description of "the inadequacy of monetary damages to make whole the loss suffered." (*Ante,* p. 447.)

The majority reject plaintiffs' claim for a second reason, i.e., that "because of its intangible character, damages for such a loss are very difficult to measure." (*Ante,* p. 448.) This merely restates the first reason, and was likewise rejected in *Rodriguez*. The loss here is no more and no less "intangible" than that experienced by Mrs. Rodriguez, whose husband became permanently incapacitated, and yet we held the valuation problem to be difficult but manageable. Quoting (at p. 402 of 12 Cal.3d) from *Millington* v. *Southeastern Elevator Co.* (1968) 22 N.Y.2d

498 [293 N.Y.S.2d 305, 312, 239 N.E.2d 897, 36 A.L.R.3d 891] we denied that loss of consortium is " 'too personal, intangible, and conjectural to be measured in pecuniary terms by a jury. This argument has no merit. The logic of it would also hold a jury incompetent to award damages for pain and suffering. [¶] Money is a poor substitute for the loss of an only child or the pain resulting from serious injuries. Likewise, it cannot truly compensate a wife for the destruction of her marriage, but it is the only known means to compensate for the loss suffered and to symbolize society's recognition that a culpable wrong—even if unintentional—has been done.' "

The majority next reason that the asserted difficulty in measuring damages "leads in turn to risk of double recovery." (*Ante,* p. 448.) Again we dismissed the identical argument in *Rodriguez,* explaining that the alleged "risk" can be avoided by the use of such well-known procedural devices as joinder of actions and appropriate instructions to the jury. (12 Cal.3d at pp. 404-407.)

The majority concede that we rejected the foregoing arguments in *Rodriguez,* but now claim they do not "read"—i.e., interpret—*Rodriguez* as holding that the arguments "do not merit consideration." (*Ante,* p. 448.) On this point, however, *Rodriguez* is crystal clear and requires no interpretation: far from implying that the double recovery argument might have some merit in another context, we characterized it in *Rodriguez* as wholly "without substance," and quoted with approval decisions which derided it as "fallacious," "fictional," and a "bogey" that is "merely a convenient cliche" for denying liability. (*Id.,* at p. 404.)

The majority next seek to distinguish *Rodriguez* on three grounds, but none is convincing. First, the majority claim *Rodriguez* "pointed out" that the spousal action for loss of consortium rests "in large part" on the impairment of the sexual life of the couple. (*Ante,* p. 448.) *Rodriguez* "pointed out" no such thing; on the contrary, we there reasoned that the nonsexual loss suffered by a spouse is at least as great as the sexual loss: "Nor is the wife's personal loss limited to her sexual rights. As we recognized in *Deshotel* (50 Cal.2d at p. 665), consortium includes 'conjugal society, comfort, affection, and companionship.' An important aspect of consortium is thus the *moral* support each spouse gives the other through the triumph and despair of life. A severely disabled

husband may well need all the emotional strength he has just to survive the shock of his injury, make the agonizing adjustment to his new and drastically restricted world, and preserve his mental health through the long years of frustration ahead. He will often turn inwards, demanding more solace for himself than he can give to others. Accordingly, the spouse of such a man cannot expect him to share the same concern for *her* problems that she experienced before his accident. As several of the cases have put it, she is transformed from a happy wife into a lonely nurse. Yet she is entitled to enjoy the companionship and moral support that marriage provides *no less than its sexual side,* and in both cases no less than her husband." (Final italics added; 12 Cal.3d at pp. 405-406.)

Precisely the same reasoning can be invoked in the case at bar: a severely disabled mother may well need all her emotional strength to survive the shock of her injury, to adjust to her newly restricted life, and to preserve her mental health through the ensuing years of frustration; and she will therefore often turn inwards, demanding more solace and comfort from her children than she can give to them in return. By its terms, *Rodriguez* applies to such a situation.

Two further points must be made in this connection, however obvious they may seem. *Rodriguez* cannot fairly be limited, as the majority imply, to sexually active couples: surely a husband or wife of advanced years suffers a no less compensable loss of conjugal society when his or her lifetime companion is grievously injured by the negligence of another. And even if *Rodriguez* were to be subjected to such a harsh restriction, surely the majority do not mean to hold that sexual activity is more worthy of the law's concern than the affection, comfort, and guidance which loving parents bestow on their children.

The majority's second purported ground of distinction may conveniently be reduced to syllogistic form: (1) if loss of parental consortium were actionable, a single accident would give rise to as many claims as the victim had minor children; (2) in our society the victim is likely to have several such children but can have only one spouse; therefore (3) to recognize the cause of action for loss of parental consortium would result in a much larger liability for individual defendants and a much larger total cost to the insured community than flow from *Rodriguez. (Ante,* pp. 448-449.)

The minor premise of the majority's argument—that an accident victim is likely to have several children under age 18—is, however, demonstrably inaccurate. In *Rodriguez* we observed that "In our society the likelihood that an injured adult will be a married man or woman is substantial," and supported that statement by a reference to the Statistical Abstract of the United States published annually by the Bureau of the Census. (12 Cal.3d at p. 400 & fn. 19.) That document showed, for example, that during the peak working years of ages 25 to 65, the proportion of all men who were married ranged between 77.8 percent and 89.7 percent. (*Ibid.*) Contrary to the majority's supposition, the same source reveals that the proportion of families with several minor children is very low: as of 1974, 46 percent of the families in the United States had no minor children and an additional 19.2 percent had only one such child, making over 65 percent of the total; conversely, only 9.5 percent of families had three minor children, and the entire class of "4 or more" such children comprised a mere 7.4 percent.[1]

The last of the quoted figures establishes that, contrary to the majority's implication, the case at bar is completely atypical of American society in the second half of the 20th century. If all the families with four or more minor children constitute only 7.4 percent of the total, the proportion of families with, as here, the extremely large number of nine children—eight of whom were minors at the time the complaint was filed—must be a minute fraction of 1 percent. In these circumstances it is manifestly misleading for the majority to assert that the fact the victim has nine children "illustrates" this ground of distinction. (*Ante,* p. 449.)

For the same reason I see no relevance in the majority's further observation that the assertion of the nine children's individual causes of action in addition to the father's claim for loss of spousal consortium and the mother's suit for personal injuries "demonstrates the extent to which recognition of plaintiffs' asserted cause of action will multiply the tort liability of the defendant." (*Ante,* p. 449.) The only point it "demonstrates" is that 9 plus 2 equal 11. It certainly does not support the majority's claim that significant multiplications of liability will be frequent events.

---

[1]Statistical Abstract of the United States (96th ed. 1975) page 42, table No. 56. The same table discloses that these proportions have remained remarkably constant over the past 25 years, varying by only a few percentage points throughout that period.

Not only do the statistics show the majority's concern to be unwarranted, they also confirm the verdict of common sense in this matter, i.e., that plaintiffs actually ask us to take a smaller, not a larger, step than we took in *Rodriguez*. Inasmuch as adult, emancipated children who are no longer living in the family home could prove little if any damage from loss of parental consortium, I assume the majority are most troubled by the prospect of claims by minor children. (See *ante*, p. 449.) Upon reflection, it will be seen that such children inevitably comprise a much more limited class than spouses, for two reasons: not all married persons have children; and of those who do, they are parents of *minor* children for a far shorter period of time than they are spouses. It is therefore not surprising that although more than three-quarters of the adult population is married, almost half of such households—46 percent—have no minor children whatever. It follows that recognition of the cause of action for loss of parental consortium will result in a lesser rather than a greater effect on individual liability and overall insurance costs than our approval of the corresponding action by a spouse in *Rodriguez*.

The majority's third proposed ground of distinction (*ante*, p. 449) deserves little comment. Emphasis is placed on the fact that no state has recognized the cause of action for loss of parental consortium, while a substantial number had permitted a spousal consortium action by the time we decided *Rodriguez*. (12 Cal.3d at pp. 389-390.) But the latter fact was invoked in *Rodriguez* to justify our departure from a directly contrary decision of this court—a hurdle we do not face here. Even while emphasizing the out-of-state authorities, moreover, we expressly warned that although we should be mindful of the trend " 'our decision is not reached by a process of following the crowd.' " (*Id.*, at p. 392.)

When that crowd is marching in the wrong direction, we have not heretofore hesitated to break ranks and strike out on our own. I need not list the many instances in which this court has initiated new trends in the law of personal torts by extending the protection of the courts to previously neglected classes of accident victims. A sufficient example is *Rowland* v. *Christian* (1968) 69 Cal.2d 108 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496], in which we judicially abolished the ancient common law distinctions between invitee, licensee and trespasser, and brought the latter two classes within the shelter of the fundamental tort doctrine that every person is responsible for injury caused by his lack of ordinary care in the management of his property. (Civ. Code, § 1714.)

The majority attempt to distinguish *Rowland* on the grounds that we deal here with a cause of action "for solely intangible damages, attended with problems of multiplication of claims and liability." (*Ante,* p. 450.) But these grounds have not only been repudiated in *Rodriguez,* they also miss the point of *Rowland:* in that case we were likewise faced with an essential unanimity of our sister jurisdictions, yet we rejected their rule for California because we believed it to be "contrary to our modern social mores and humanitarian values." (69 Cal.2d at p. 118.) We would do well to be guided by those same values in the task at hand.

I conclude that there is no escaping the conflict between the reasoning of the majority herein and the letter and spirit of *Rodriguez.* Yet the majority repeatedly reaffirm the holding of that decision. One can only infer that the majority's true motivation is neither the claimed inadequacy of monetary compensation for this loss, nor the difficulty of measuring damages, nor the danger of disproportionate liability. These are mere window-dressing, designed to lend an appearance of logic and objectivity to what is in fact a purely discretionary exercise of the judicial power to limit the potential liability of common law tortfeasors. The majority suggest their actual incentive earlier in the opinion, when they reason that the victim foreseeably has not only a husband, children, and parents, but also "brothers, sisters, cousins, inlaws, friends, colleagues, and other acquaintances who will be deprived of her companionship. No one suggests that all such persons possess a right of action for loss of [the victim's] consortium; all agree that somewhere a line must be drawn." (*Ante,* p. 446.)

I agree that it must, but I cannot subscribe to the majority's ad terrorem argument for determining the proper place to draw such a line. The majority raise the spectre of liability not only to the victim's spouse but also to a Gilbert and Sullivan parade of "his sisters and his cousins, whom he reckons up by dozens," then dismiss that possibility with the unimpeachable observation that no one is suggesting the latter be compensated. The implication lingers, however, that such demands will become irresistible if the rights of the victim's children are recognized in the case at bar.

Again we rejected a similar argument in *Rodriguez* (12 Cal.3d at pp. 402-403), relying principally on our decision in *Dillon* v. *Legg* (1968)

68 Cal.2d 728 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316]. The teaching of those cases is that the rights of a proposed new class of tort plaintiffs should be forthrightly judged on their own merits, rather than by indulging in gloomy speculation on where it will all end. As we summarized in *Rodriguez,* "That the law might be urged to move too far, in other words, is an unacceptable excuse for not moving at all." (12 Cal.3d at p. 404.)

When we focus accordingly on the precise issue of whether a minor child should have a cause of action for negligent deprivation of parental consortium, the decision is not difficult. The majority readily concede both "the reality [and] the magnitude of the injury" suffered by plaintiffs herein. (*Ante,* p. 453.) And as shown above, the obstacles to recovery for such injury are essentially illusory: monetary damages are no less adequate and no more difficult to fix than in other cases of mental suffering, and recognition of this cause of action will have a smaller effect on liability and insurance costs than our decision in *Rodriguez*—indeed, in a substantial proportion of instances it will have no such effect at all. It follows that the case is controlled by "the general principle that a person is liable for injuries caused by his failure to exercise reasonable care in the circumstances" (*Rowland* v. *Christian* (1968) *supra,* 69 Cal.2d 108, 112), and the complaint should be held good against a demurrer.

There is, in short, no valid excuse for denying these children their day in court. Justice, compassion, and respect for our humanitarian values require that the "line" in this matter be drawn elsewhere.

I would reverse the judgment.

Appellants' petition for a rehearing was denied June 2, 1977. Bird, C. J., and Mosk, J., were of the opinion that the petition should be granted.