Erica Mae STILL, by her next friend and grandmother, Florence Faye ERLANDSON, Plaintiff–Appellant,

v.

BAPTIST HOSPITAL, INC. and James W. Johnson, M.D., Defendants–Appellees.

No. 87–381–II.

Court of Appeals of Tennessee, Middle Section, at Nashville.

May 20, 1988.

John T. Conners, Jr., William D. Leader, Jr., Boult, Cummings, Conners & Berry, Nashville, for plaintiff-appellant.

Gayle Malone, Jr., Jeffrey Zager, Trabue, Sturdivant & DeWitt, Nashville, for defendant-appellee Baptist Hosp., Inc.

W.W. McNeilly, Jr., John B. Carlson, Watkins, McGugin, McNeilly & Rowan, Nashville, for defendant-appellee James W. Johnson, M.D.

## OPINION

CANTRELL, Judge.

The plaintiff, Erica Mae Still, a minor, brought suit by her next friend and grandmother Florence Faye Erlandson to recover damages "for the loss of services, care, society, companionship, love, and support" her mother, who the complaint alleges was permanently mentally and physically disabled through the negligence of the defendants, would otherwise have given her. The defendants moved to dismiss the claim under Tenn.R.Civ.Proc. 12.02(6) for failure to state a claim upon which relief can be granted. The trial judge dismissed the complaint, and the plaintiff appeals.

The facts alleged in the complaint are as follows: The plaintiff was born on October 2, 1986 at the Baptist Hospital in Nashville. She is the only child of Pamela Still. Defendant Johnson was the attending obstetrician. Pamela and Erica were discharged on October 5, but about a week later Pamela was readmitted to the hospital suffering from post-partum bleeding. Dr. Johnson operated on Pamela on October 15 to stop the bleeding. On the evening of October 16, Pamela had a "brain seizure" which resulted in permanent mental and physical disability. The complaint alleges that Dr. Johnson negligently failed to diagnose and treat Pamela, and, somewhat inconsistently, that the employees of Baptist Hospital failed to follow properly Dr. Johnson's instructions to treat Pamela, resulting in the seizure.

The plaintiff and the defendants agree that a cause of action for loss of parental consortium has not heretofore been recognized in Tennessee. Such an action was unknown at common law and unanimously rejected by courts until recent years. *See* Annot., 11 A.L.R. 4th 549 (1982). Beginning with a 1980 decision of the Supreme Judicial Court of Massachusetts, *Ferriter v. Daniel O'Connell's Sons*, 381 Mass. 507, 413 N.E.2d 690 (1980), appellate courts in several states have stated that a child has the same interest in the consortium of a parent as spouses have in each other,[1] and have permitted recovery for its loss.

The plaintiff's position is summarized by the following quote:

"A child has an interest in the society and affection of his parent. Furthermore, the society, education, protection and love of a parent is necessary for the child's welfare and development.... When the child is deprived of his parents' society, care, protection and affection he suffers a real injury.... Similarly, the child's loss of his parents' love, society and protection deprives him of the essentials for a healthy development and thus results in a real injury to the child.

Protection of the child against this type of injury to the family relationship is equally important to the state. Since the character of the child has an impact on society 'it is of the highest importance to the child and society that its rights to receive the benefits derived from its mother [or father] be protected.'"

Comment, *The Child's Claim for Loss of Consortium Damages: A Logical and Sympathetic Appeal*, 13 San Diego L.Rev. 231, 237–8 (1975) (footnotes omitted).

This view, in addition to being accepted by the courts in the cases cited above, has been supported by eminent text writers. *See* W. Keeton, *Prosser and Keeton on Torts* 934–5 (5th ed. 1987); 1 H. Clark, *The Law of Domestic Relations* 689–92 (2d ed. 1987). The vast majority of courts, however, have refused to recognize the cause of action.[2]

---

1. The other decisions are: *Hibpshman v. Prudhoe Bay Supply Inc.*, 734 P.2d 991 (Alaska 1987); *Hay v. Medical Center Hospital of Vermont*, 145 Vt. 533, 496 A.2d 939 (1985); *Ueland v. Reynolds Metals Co.*, 103 Wash.2d 131, 691 P.2d 190 (1984); *Theama v. Kenosha*, 117 Wis. 2d 508, 344 N.W.2d 513 (1984); *Audubon–Exira v. Illinois C.G.R. Co.*, 335 N.W.2d 148 (Iowa 1983); *Berger v. Weber*, 411 Mich. 1, 303 N.W.2d 424 (1981). *See also Reighley v. International*

*Playtex, Inc.*, 604 F.Supp. 1078 (Colo.1985) (construing Colorado law); *Dhalival v. Morrisette*, [1982] 1 W.W.R. 286, 32 B.C.L.R. 225 (S.C.) (British Columbia law).

2. See *Zorzos v. Rosen*, 467 So.2d 305 (Fla.1985); *Lewis v. Rowland*, 287 Ark. 474, 701 S.W.2d 122 (1985); *W.J. Bremer Co. v. Graham*, 169 Ga.App. 115, 312 S.E.2d 806 (1983), *writ den.* 252 Ga. 36, 312 S.E.2d 787 (1984); *Norwest v. Presbyterian Intercommunity Hospital*, 293 Or. 543, 652 P.2d

Naturally the parties differ sharply on whether a cause of action for loss of parental consortium should be recognized in Tennessee. The defendants maintain that since the cause of action was unknown at common law, a change now would involve policy questions so complex and such conflicting interests that the matter should be left to the General Assembly. The plaintiff argues that since actions for loss of consortium originated with the common law courts, this court would be justified in extending the scope of the action if it sees fit.

### The History of Consortium

#### I.

Holdsworth, in discussing the origins of laws concerning domestic relations, emphasizes that laws concerning wards, infants, wives, and servants were more heavily stressed than today, and that property law and remedies for infringement of proprietary rights were more highly developed than contract law. This has resulted, he said, in the unsatisfactory state of some of the rules in this area down to the present day. 8 W. Holdsworth, *A History of English Law* 427 (1926). It was well established that a master had a "quasi-proprietary" interest in his servants' services, a holdover from the feudal relationship between a serf and his lord.

Because married women, in the centuries before the Married Women's Property Acts, were considered as one with their husbands,[3] they had no status to sue on their own behalf for wrongs committed against them. The husband would sue for the damages and join his wife in the action. In the early part of the seventeenth century, the courts concluded that a husband's interest in his wife's services was analogous to the interest he had in a servants service's, and he could sue in his own name, without joining his wife, if they were lost. Holdsworth, *supra*, 429–30.

In *Guy v. Livesey*, Cro.Jac. 501, 79 Eng. Rep. 428 (1619), the plaintiff sued the defendant for the battery of himself as well as for the battery of his wife

> and it was found against [the defendant] in both ... and the damages given, for that the plaintiff's wife went with the defendant and lived with him in a suspicious manner. And it was now moved in arrest of judgment, that the husband ought not to join the battery of his wife with the battery which was done to himself; *and he cannot have an action for the battery of his wife ... so the defendant may be twice punished for one and the same battery....* [Emphasis added].

The Court, however, saw the analogy between husband and wife and master and servant:

> But all the Court held, that the action was well brought; for the action is not brought in respect of the harm done to the wife, but is brought for the particular loss of the husband, for that he lost the company of his wife, ... for which he shall have this action, as the master shall have for the loss of his servant's service.

318 (1982); *Salin v. Kloempken*, 322 N.W.2d 736 (Minn.1982); *Mueller v. Hellrung Const. Co.*, 107 Ill.App.3d 337, 63 Ill.Dec. 140, 437 N.E.2d 789 (1982); *DeAngelis v. Lutheran Medical Center*, 84 A.D.2d 17, 445 N.Y.S.2d 188 (1981), *affirmed* 58 N.Y.2d 1053, 462 N.Y.S.2d 626, 449 N.E.2d 406 (N.Y.1983); *Morgel v. Winger*, 290 N.W.2d 266 (N.D.1980); *Hoesing v. Sears, Roebuck & Co.*, 484 F.Supp. 478 (D.Neb.1980) (Nebraska law); *Bradford v. Union Electric Co.*, 598 S.W.2d 149 (Mo.App.1979); *Borer v. American Airlines*, 19 Cal.3d 441, 138 Cal.Rptr. 302, 563 P.2d 858 (1977); *Hickman v. Parish of East Baton Rouge*, 314 So.2d 486 (La.App.1975), *writ ref.* 318 So.2d 59 (La.1975); *Early v. United States*, 474 F.2d 756 (9th Cir.1973) (Alaska law); *General Electric Co. v. Bush*, 88 Nev. 360, 498 P.2d 366 (1972); *Russell v. Salem Transportation Co.*, 61 N.J. 502, 295 A.2d 862 (1972); *Hoffman v. Dautel*, 189

Kan. 165, 368 P.2d 57 (1962); *Pleasant v. Washington Sand & Gravel Co.*, 262 F.2d 471 (D.C.Cir. 1958) (District of Columbia law); *Turner v. Atlantic Coast Line R.R.*, 159 F.Supp. 590 (N.D.Ga. 1958) (South Carolina law); *Meredith v. Scruggs*, 244 F.2d 604 (9th Cir.1957) (Hawaii law); *Gibson v. Johnson*, 144 N.E.2d 310 (Ohio App.1956); *Jeune v. Del E. Webb Const. Co.*, 77 Ariz. 226, 269 P.2d 723 (1954), *overruled on other grounds, City of Glendale v. Bradshaw*, 108 Ariz. 582, 503 P.2d 803 (1972).

**3.** It was on being informed that the law considered every man to be the master of his wife that Dickens' Mr. Bumble exclaimed, "If that is the law, then the law is a ass—a idiot. If that's the eye of the law, then the law's a bachelor."

*Id.* at 502, 79 Eng.Rep. at 428. *See also Hyde v. Scyssor,* Cro.Jac. 538, 79 Eng.Rep. 462 (1620).

### II.

Thus was the modern law of consortium created. Over the years it became firmly entrenched in the common law, even as the original reasons for its existence withered away. As Oliver Wendell Holmes, Jr., once noted:

> A very common phenomenon, and one very familiar to the student of history, is this. The customs, beliefs, or needs of a primitive time establish a rule or a formula. In the course of centuries the custom, belief, or necessity disappears, but the rule remains. The reason which gave rise to the rule has been forgotten, and ingenious minds set themselves to inquire how it is to be accounted for. Some ground of policy is thought of, which seems to explain it and to reconcile it with the present state of things; and then the rule adopts itself to the new reasons which have been found for it, and enters on a new career. The old form receives a new content, and in time even the form modifies itself to fit the meaning which it has received. The subject under consideration illustrates this course of events very clearly.

O.W. Holmes, *The Common Law,* 5.

It was very clearly recognized, in the early seventeenth century, that a cause of action *per quod consortium amisit* ("whereby he lost the company [of his wife]") would permit double recovery for the same tort, as the extract from *Guy v. Livesey* shows. The analogy between wives and servants, however, appeared to be strong enough to overcome the inequity of double recovery. Yet, despite the fact that no one today would justify recovery on such grounds, the law of consortium, true to Holmes' hypothesis, has been a hardy survivor in the jungle of junked common law rules. Even as the equation of wives with servants was disappearing, actions for consortium survived various challenges to their validity, and seemed, in fact, to take on a new and vigorous lease on life.

The passage of married women's property acts which purported to emancipate married women "from all disability on account of coverture," and abrogate "the common law as to the disabilities of married women" (*see* 1913 Tenn.Pub. Acts ch. 26, codified at Tenn.Code Ann. § 36–3–504) was held in Tennessee and in most other states not to abolish a husband's right to the services of his wife; and therefore actions *per quod consortium amisit* could continue to be maintained by husbands, *City of Chattanooga v. Carter,* 132 Tenn. 609, 611, 179 S.W. 127 (1915), although there were for a time decisions in other states to the contrary. *See, e.g., Bolger v. Boston Elevated R.R. Co.,* 205 Mass. 420, 91 N.E. 389 (1910). The Tennessee Supreme Court in *Carter* stated that the Act encompassed only a married women's property rights in marriage, not her personal rights, and concluded: "The act does not deprive either the husband or wife of the conjugal relationship, with its duties and rights." 132 Tenn. at 611, 179 S.W. at 127.

Rather than being annihilated by newer views of a woman's place in marriage, the notion of consortium appeared to gather strength from it. As we have seen, the original rationale for actions *per quod consortium amisit* was that a man's loss of his wife's domestic services was comparable to the loss of a servant's services. In the nineteenth century it was still understood that it was only such losses which were a concern of the law.

It was on this basis that courts consistently refused to recognize an action *per quod consortium amisit* in the wife. In the leading case of *Lynch v. Knight,* 9 H.L.Cas. 577, 11 Eng. Rep. 854 (Ire.1861), Lord Wensleydale stated:

> The loss of [the wife's domestic services] the husband, who alone has all the property of the married parties, may repair by hiring another servant; but the wife sustains only the loss of the comfort of her husband's society and affectionate attention, which the law cannot estimate or remedy.

*Id.* at 599, 11 Eng. Rep. at 863.

Not long after, and with surprising speed, courts in America began holding

that the action did encompass the intangibles of what Lord Wensleydale called "society and affectionate attention." *See Denver Consol. Tramway Co. v. Riley,* 14 Colo.App. 132, 59 P. 476 (1899) ("The wife does not occupy the position of a servant, and her services to her husband are not those of a servant."); *Furnish v. Missouri Pacific R. Co.,* 102 Mo. 669, 15 S.W. 315 (1890); *see* generally W. Keeton, *Prosser and Keeton on Torts* § 125 (1984). Indeed, the notion that consortium refers primarily to love, companionship, affection, support, and—implicitly where not explicitly—sexual relations became so entrenched that one reported Tennessee case refers to "loss of services and consortium," apparently assuming that "consortium" includes every element of the modern cause of action except the one originally intended. *Dunn v. Alabama Oil & Gas Co.,* 42 Tenn. App. 108, 299 S.W.2d 25 (1956). "Consortium" had come to mean precisely the opposite of what had been intended.

### III.

The inclusion of these intangibles in the action for loss of consortium was one more step in the process of forgetting the origin and purpose of the original action, and made all the easier the next logical step in the development of this chameleon of the law. In 1950, the U.S. Court of Appeals for the District of Columbia decided the case of *Hitaffer v. Argonne Co.,* 183 F.2d 811 (D.C.Cir.1950), and recognized a wife's cause of action for loss of her husband's consortium, stating:

> Consortium, although it embraces within its ambit of meaning the wife's material services, also includes love, affection, companionship, sexual relations.... [T]here can be no rational basis for holding that in negligent invasions suability (sic) depends on whether there is a loss of services.

*Id.* at 814.

The *Hitaffer* decision started a trend.[4] Its expansive view of the meaning of con-

sortium was, of course, already well established and caused no difficulty, but in the following thirty years many jurisdictions extended the right to bring action for loss of consortium to wives as well as husbands by judicial fiat. Many other jurisdictions, including Tennessee, refused to extend the common law in this fashion, and left the matter to legislative bodies.

In the 1960's, the Supreme Court of Tennessee twice considered the question and in both instances deferred to the Legislature. *Rush v. Great American Ins. Co.,* 213 Tenn. 506, 376 S.W.2d 454 (1964); *Krohn v. Richardson–Merrell, Inc.,* 219 Tenn. 37, 406 S.W.2d 166 (1966), *cert. den.* 386 U.S. 970, 87 S.Ct. 1160, 18 L.Ed.2d 129 (1967). In *Rush,* the court stated:

> [W]e believe this to be a matter for the decision of the Legislature and not for the courts. Such matters are committed to the intelligence and discretion of the members thereof and the courts will not run a race of opinion with these representatives of the people upon the question of the wisdom and propriety of such legislation.

*Id.* at 518–19, 376 S.W.2d at 459.

Two years later, the Supreme Court reiterated this holding. *Krohn v. Richardson–Merrell, Inc., supra,* 219 Tenn. at 41, 406 S.W.2d at 168.

In 1969, the Legislature enacted a bill allowing wives to recover for loss of consortium. 1969 Tenn.Pub. Acts ch. 1, codified at Tenn.Code Ann. § 25–1–106 (1977).

The history of the action for loss of consortium, then, is a perfect illustration of Holmes' thesis. Once the justification for the original action was discredited, the courts justified the action, in large part, by concluding that it properly provided compensation for the very losses—comfort, companionship, affection—that previous courts had held noncompensible. And once that justification was accepted, and indeed became paramount, it was largely a matter

---

4. The Supreme Court of North Carolina had allowed a wife to recover for loss of her husband's consortium in *Hipp v. E.I. Dupont de Nemours & Co.,* 182 N.C. 9, 108 S.E. 318 (1921), but reversed itself four years later in *Hinnant v. Tidewater Power Co.,* 189 N.C. 120, 126 S.E. 307 (1925).

of time before the logic of extending the right of action to wives as well as husbands should seem inescapable.

### Children's Actions for Loss of Consortium

#### I.

The courts and commentators who have embraced the idea that children deserve compensation when their parents are injured are often at great pains to show that a child can suffer real and irreparable harm from such injury. They point out that

> It is common knowledge that a parent who suffers serious physical or mental injury is unable to give his minor children the parental care, training, love and companionship in the same degree as he might have but for the injury. Hence, it is difficult for the court, on the basis of natural justice, to reach the conclusion that this type of action will not lie. Human tendencies and sympathies suggest otherwise. Normal home life for a child consists of complex incidences in which the sums constitute a nurturing environment. When the vitally important parent-child relationship is impaired and the child loses the love, guidance and close companionship of a parent, the child is deprived of something that is indeed valuable and precious. No one could seriously contend otherwise.

*Theama v. City of Kenosha*, 117 Wis.2d 508, 344 N.W.2d 513, 516 (1984), quoting *Hoffman v. Dautel*, 189 Kan. 165, 168, 368 P.2d 57, 59 (1962).

We agree that the above statement is undeniable. That it is true, however, does not foreclose further inquiry into the merits of fashioning a legal remedy to redress the child's loss, "natural justice" notwithstanding.

First, we should be cautious in judicially creating a cause of action in an area where the Supreme Court has more than once indicated its preference to allow the legislature to decide whether its scope should be extended. It is true that the precedents involved are more than twenty years old, and the plaintiff cites a number of recent decisions by the Supreme Court in which long-established common-law rules were abandoned or altered. *See Davis v. Davis*, 657 S.W.2d 753 (Tenn.1983) (cause of action for interspousal torts recognized); *Kilbourne v. Hanzelik*, 648 S.W.2d 932 (Tenn. 1983) (allowing a wife to recover medical expenses paid on behalf of a tortiously injured husband); *Cardwell v. Bechtol*, 724 S.W.2d 739 (Tenn.1987) ("mature minors" need not obtain parental consent before receiving treatment from doctors); *Arnold v. Hayslett*, 655 S.W.2d 941 (Tenn.1983) (minors capable of contributory fault). Of course, many more such examples could be cited. Unswerving adherence to precedent has never been the rule in this country, or in this state. No one would argue that the plaintiff's general proposition, that a court-made rule can be changed by the courts, is unsound. However,

> For the Court to find that no public policy prevents the continuing development of the common law is wholly different from positively declaring the public policy of the State.

*Smith v. Gore*, 728 S.W.2d 738, 747 (Tenn. 1987). "All questions of policy are for the determination of the legislature, and not the courts.... Where courts intrude into their decrees their opinion on questions of public policy, they in effect constitute the judicial tribunals as legislative bodies in usurpation of the powers of the legislature." *Id.*, quoting *Cavender v. Hewitt*, 145 Tenn. 471, 475–6, 239 S.W. 767, 768 (1921). In drawing the line between cases where alterations to common law should and should not be attempted, it is well to keep in mind the novelty and magnitude of the proposed change. In cases where the consequences are apt to be far-reaching, deference to the legislature, absent extraordinary circumstances, is more likely to be appropriate.

Regardless of the jurisprudential niceties, we believe that the policy considerations are against the plaintiff in this case.

As pointed out earlier in this opinion, the danger that allowing actions *per quod consortium amisit* would result in a double recovery for the same wrong was recog-

nized from the very beginning. *Guy v. Livesey, supra.* The courts denied that there was any double recovery because the recovery was in reality for the value of the wife's services. With the nineteenth century's broader definition of what losses the husband might sue for, this fiction, if it was a fiction, became even more difficult to maintain. From one tort, and one tortfeasor, might flow damages to two persons, one of whom the tortfeasor might not have known existed. That the unknown spouse might have suffered a real injury at the hands of the tortfeasor, albeit at some remove, is true. That the existence of such a spouse is foreseeable under the well-known rule of *Palsgraf v. Long Island R.R.*, 248 N.Y. 339, 162 N.E. 99 (1928), is also true. But the injured party is entitled at law to compensation from the tortfeasor for the concrete amount of the expenses to which he was put by the injury, as well as the speculative and uncertain amount of his pain and suffering. His spouse is also entitled to the speculative and uncertain damages resulting from the impairment or loss of consortium. Now, the plaintiff in the instant case would like to add yet another layer of plaintiffs, with still more speculative monetary claims against the tortfeasor. Logic and justice, they maintain, dictate this result. But if children may recover damages, reasoning by analogy from the ability of spouses to do so, it would be difficult to deny the equally compelling logic and justice of allowing other relatives, friends, and even employees to recover damages on the same grounds.

> The duty there which gives rise to the husband's cause of action arises out of what for convenience may be called proximity; the driver owes a duty not to injure other persons who are using the road on which he is driving. He owes no duty to persons not present except to those whose property may be on or adjoining the road.... It may often happen that an injury to one person may affect another; a servant whose master is killed or permanently injured may lose

his employment, [which] may be of long standing, and the misfortune may come when he is of an age when it would be very difficult for him to obtain other work, but no one would suggest that he thereby acquires a right of action against the wrongdoer.

*Best v. Samuel Fox & Co.*, [1952] AC 716, 731 (per Lord Goddard).

Other than consortium actions, "[t]here are few other instances where a secondary tort victim has been permitted to recover for a negligently inflicted injury to a relational interest unaccompanied by physical injury to himself." *Berger v. Weber*, 411 Mich. 1, 303 N.W.2d 424, 435 (1981) (Levin, J., dissenting). Apart from the action of intentional infliction of emotional distress, Justice Levin continues, the most common exception to this are those wrongful death statutes which allow recovery for the decedent's society and companionship. *Id.*, fn. 44. Most of the courts which have recognized a child's loss of consortium have noted, as a basis for the decision, that their state's wrongful death statute provides for just such a recovery. *See id.* 303 N.W.2d at 426 (majority opinion); *Hay v. Medical Center Hospital of Vermont, supra* note 1, 496 A.2d at 941; *Ferriter v. Daniel O'Connell's Sons, supra* note 1, 413 N.E. 2d at 695; *Ueland v. Reynolds Metals Co., supra* note 1, 691 P.2d at 192.

Our Tennessee Wrongful Death Act is primarily a survival statute. If the decedent could not have sued, no right survives. *McCreary v. Nashville, C. & St. L.R. Co.*, 161 Tenn. 691, 695, 34 S.W.2d 210, 211 (1931). It does not provide for recovery for grief or loss of consortium by the decedent's children. *Davidson Benedict Co. v. Severson*, 109 Tenn. 572, 633, 72 S.W. 967 (1902). Therefore, the analogy to the wrongful death statute has no application in this state.[5]

It should also be noted that in a case where a minor child has been injured, his parents may sue only for expenses and loss of his services, not society and companion-

---

**5.** Even if the Tennessee statute provided for such a recovery, actions for wrongful death are distinguishable from those for negligent injury.

*See Berger v. Weber, supra* note 1, 303 N.W.2d at 441–2 (Levin, J., dissenting).

ship. Tenn.Code Ann. § 20–1–105. This is consistent with the common law, though a statutory enactment.

Furthermore, the blithe assumption that monetary damages can be accurately estimated or provide any sort of meaningful compensation in this type of action is questionable. As the California Supreme Court put it in an oft-quoted passage:

> Loss of consortium is an intangible, nonpecuniary loss; monetary compensation will not enable plaintiffs to regain the companionship and guidance of a mother; it will simply establish a fund so that upon reaching adulthood, when plaintiffs will be less in need of maternal guidance, they will be unusually wealthy men and women.... [T]hey have obtained ... a future benefit essentially unrelated to [their] loss.

*Borer v. American Airlines,* 19 Cal.3d 441, 447, 138 Cal.Rptr. 302, 306, 563 P.2d 858, 862 (1977).

The court also illustrated the difficulty in determining the proper amount of damage awards in such cases:

> Plaintiffs here have prayed for $100,000 each; yet by what standard could we determine that an award of $10,000 is inadequate, or one of $500,000 excessive? Difficulty in defining and quantifying damages leads in turn to risk of double recovery: to ask the jury, even under carefully drafted instructions, to distinguish the loss to the mother from her inability to care for her children from the loss to the children from the mother's inability to care for them may be asking too much.

*Id.* at 448, 138 Cal.Rptr. at 307, 563 P.2d at 863. *Accord Russell v. Salem Transportation Co.,* 61 N.J. 502, 295 A.2d 862 (1972); *Norwest v. Presbyterian Intercommunity Hospital,* 293 Ore. 543, 652 P.2d 318 (1982).[6]

In the case before us, Erica Mae Still is the only plaintiff. In the *Borer* case, there were nine plaintiffs, the minor children of an injured mother. Currently actions for loss of consortium are limited to one person, the spouse of the injured individual. Where the cause of action is extended to others, the line of potential plaintiffs may stretch to infinity.

> The law of damages aims at compensation for the actual loss sustained, but within these limits: In tort liability arises in invitum, by force of law; and the extent of liability is fixed by law independently of the wrongdoer's consent. The law holds him liable not for all the harm that follows his wrong, not for all its consequences, but only for its proximate consequences.

*Black v. Love and Amos Coal Co.,* 30 Tenn.App. 377, 383, 206 S.W.2d 432, 434 (1947), quoted in *Smith v. Gore,* supra, 728 S.W.2d at 749.

> [W]e cannot trace the effect of an act to the end, if end there is.... What we do mean by the word "proximate" is that because of convenience, of public policy, of a rough sense of justice, the law arbitrarily declines to trace a series of events beyond a certain point. This is not logic. It is practical politics.

*Palsgraf v. Long Island R.R.,* 248 N.Y. 339, 162 N.E. 99, 103 (1928) (Andrews, J., dissenting).

Although logic, in one sense, may seem to require that a tortfeasor make good *all* of the damages resulting from his conduct, our laws are not, and as Judge Andrews recognized, cannot be made entirely logical or even consistent. In considering this question in the context of extending actions for consortium, Lord Goddard said:

> My Lords, so entirely has the concept of the relation of husband and wife and master and servant changed since the days of Bracton, and indeed of Blackstone, that I agree ... that if the matter were now *res integra* the law ... would refuse to give an action to the husband merely for the loss of consortium due to negligence. It is too late now for the courts to deny an action which has existed for hundreds of years. It is an anom-

---

**6.** In *Dhalival v. Morrisette,* [1982] 1 W.W.R. 286, 32 B.C.L.R. 225, the Supreme Court of British Columbia upheld an award of $5000 to a child whose mother was permanently physically and mentally injured in a car accident.

aly at the present day that a husband can obtain damages for an injury to his wife, but English law is free neither of some anomalies nor of everything illogical, but this is no reason for extending them. *Best v. Samuel Fox & Co., supra*, [1952] A.C. at 732–3.

### Conclusion

We have examined the history of consortium at some length, not for the purpose of criticizing the rule as it now stands, but simply in order to show that denial of the plaintiff's cause of action is not an anomaly; rather, it is the rule itself that is the anomaly. The validity of the present-day law of consortium cannot, as Lord Goddard pointed out, be questioned by the courts at this late date. But it should be understood that the overwhelming practical reasons for denying the cause of action are not contrary to the spirit and logic of the original rule, no matter how haphazard its subsequent growth.

We think the question presented in this case should be left to the consideration of the legislature.

The judgment of the trial court is affirmed, and the case remanded for any proceedings which may be required. Tax the costs on appeal to the appellant.

TODD, P.J., and LEWIS, JJ., concur.