******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ZARELLA, J., with whom ESPINOSA and ROBINSON, Js., join, dissenting. It is not the duty of this court to make law. That is a task properly left to the legislature. "To do otherwise, even if based on sound policy and the best of intentions, would be to substitute our will for that of a body democratically elected by the citizens of this state and to overplay our proper role in the theater of [state] government." *DeSantis* v. *Prelle*, 891 A.2d 873, 881 (R.I. 2006). In the present case, the majority steps beyond the limited role of judicial decision making and into the role of lawmaking by recognizing a new cause of action for loss of parental consortium. I therefore respectfully dissent.

In *Mendillo* v. *Board of Education*, 246 Conn. 456, 717 A.2d 1177 (1998), we declined to recognize a common-law claim for the loss of parental consortium. Id., 461, 477. Our rationale was "that the balance of reasons and public policies tips against the recognition of such a claim." Id., 477. In the present case, however, after concluding that the benefits of recognizing a loss of parental consortium claim now outweigh its costs, the majority decides to abandon *Mendillo* and recognize such a claim. I cannot agree. I express no opinion as to the merits of recognizing such a claim from a policy perspective. Rather, as a matter of prudence, I believe it is unwise to create such a claim by judicial authority. In my view, this is a matter best left to the sound judgment of the legislature. Accordingly, I would affirm the judgment of the trial court.

I do not dispute that this court has the authority to change the common law to conform to the times. In a society of ever increasing interdependence and complexity, however, it is an authority this court should exercise only sparingly. Restraint is especially required when we are asked, as in this case, to address policy questions concerning families and familial relationships.[1] The majority outlines five policy considerations that underlie whether this court should recognize a cause of action for loss of parental consortium, and there are undoubtedly more that are implicated. However, these considerations can properly be evaluated only after gathering and considering all of the relevant facts, many of which are not before us in this case.

Indeed, we previously have recognized that "[i]t is not the role of this court to strike precise balances among the fluctuating interests of competing private groups . . . . That function has traditionally been performed by the legislature, which has far greater competence and flexibility to deal with the myriad complications which may arise from the exercise of . . . rights by some in diminution of those of others." *Cologne* v. *Westfarms Associates*, 192 Conn. 48, 65, 469

A.2d 1201 (1984). Thus, the legislature, unlike this court, is institutionally equipped to gather *all* of the necessary facts to determine whether a claim for loss of parental consortium should be permitted and, if it should, how far it should extend. The legislature can hold public hearings, collect data unconstrained by concerns of relevancy and probative value, listen to evidence from a variety of experts, and elicit input from industry and society in general. Further, elected legislators, unlike the members of this court, can be held directly accountable for their policy decisions. Finally, the legislature can produce a comprehensive policy by enacting a statutory scheme that provides notice and predictability to insurers and insureds that allows them to plan accordingly.

In contrast, this court is limited to deciding only the cases and questions before it, and, therefore, it is restricted to the facts presented in this case. As a result, there is no evidence or data before this court regarding the consequences of allowing this new claim. The court has not heard from, and cannot consult, experts regarding the likely increases in litigation, jury awards, or insurance premiums. Likewise, statistics regarding the average Connecticut family size and structure—for example, how many Connecticut children are raised by adults other than their legal parents, such as aunts and uncles, grandparents, older siblings, foster parents, etc.—are not before the court. Additionally, this court has heard no "testimony" regarding the impact the recognition of a claim for loss of parental consortium has had in states that have allowed it. Undoubtedly, these are all important considerations when the public policies that underlie a claim for loss of parental consortium are weighed. Moreover, "the judicial process, though public in name, is private in essence. The public cannot broadly petition [a] court to urge it to reach a particular result . . . . [A court cannot] take testimony from all the persons or factions who may have an interest, or effectively weigh the competing interests that they may have." R. Young, "A Judicial Traditionalist Confronts the Common Law," 8 Tex. Rev. L. & Pol. 299, 304 (2004). Consequently, this court's ad hoc decisions regarding the extent and limits of a claim for loss of parental consortium will provide no predictability, and determinations of whether liability exists will be made only after harm has occurred. Thus, the question of whether to overturn *Mendillo* should be left to the legislature.

Setting aside the fact that this court should not be making this policy determination, I note that the weight of authority in other jurisdictions suggests that *Mendillo* was correctly decided. The majority claims that "the vast majority of states have recognized the cause of action, either for cases arising from a parent's injury, or for cases arising from a parent's death, or both." The majority is incorrect. In fact, only a minority of states have recognized the cause of action the majority cre-

ates, and, of those states, *only one* has done so in the absence of some legislative pronouncement regarding relevant public policy.

Before I review the decisions of our sister states, it is important to properly frame the cause of action in question. In its analysis, the majority relies on, and thus conflates, authority from other jurisdictions recognizing two distinct and separate causes of action: loss of consortium arising from a nonfatal parental injury and loss of consortium arising from a parent's wrongful death. These are very different causes of action and must be treated as such. In the present case, the issue is whether the court should recognize a cause of action for the loss of consortium arising from a nonfatal parental injury. It is therefore appropriate to rely on only those cases involving this same claim. A claim for the loss of consortium arising from a parent's wrongful death is an entirely different claim, and, therefore, to the extent the majority relies on authority from jurisdictions that recognize that claim, its reliance is misplaced.[2]

Mindful of this distinction, my review reveals that only seventeen states have recognized a claim for the loss of consortium arising from a nonfatal parental injury,[3] with twenty-eight states and the District of Columbia declining to recognize such a claim.[4] The law in the remaining five states is either unclear or those states have not addressed this question.[5]

Moreover, it is not enough to undertake a survey of our sister states and tally how many have or have not recognized a cause of action for loss of parental consortium. A deeper reading of the cases is required to develop a full understanding of the weight of authority. The majority states that "we no longer can conclude that the weight of authority supports our holding in *Mendillo*, much less that it does so overwhelmingly." Text accompanying footnote 15 of the majority opinion. The weight of authority, however, has remained largely unchanged since our decision in *Mendillo*. Indeed, all three states that have considered the viability of a cause of action for loss of parental consortium arising from a parent's nonfatal injury since *Mendillo* was decided in 1998 have declined to recognize this claim. See *Lambert* v. *Franklin Real Estate Co.*, 37 S.W.3d 770, 780 (Ky. App. 2000); *Harrington* v. *Brooks Drugs, Inc.*, 148 N.H. 101, 104, 808 A.2d 532 (2002); *Taylor* v. *Beard*, 104 S.W.3d 507, 511 (Tenn. 2003). But cf. *Brenneman* v. *Board of Regents*, 135 N.M. 68, 72, 84 P.3d 685 (App.) (allowing recovery for loss of parental consortium under New Mexico Tort Claims Act), cert. denied, 135 N.M. 51, 84 P.3d 668 (2003). The last state to recognize a claim for loss of parental consortium in connection with a parent's nonfatal injury was Ohio in 1993, five years *before Mendillo*. See *Gallimore* v. *Children's Hospital Medical Center*, 67 Ohio St. 3d 244, 255, 617 N.E.2d

1052 (1993). Thus, there has been no change in the weight of authority since our decision in *Mendillo*.

With respect to the basis for creating such a cause of action, four of the seventeen states that recognize the claim have done so by statute.[6] Thus, the majority cannot rely on these four states to support its decision to create a cause of action judicially because each of those states created the cause of action through acts of their legislatures. Furthermore, in at least one of these states, the legislative act superseded an earlier court decision expressly declining to recognize a cause of action for loss of parental consortium. *Zorzos* v. *Rosen ex rel. Rosen*, 467 So. 2d 305, 307 (Fla. 1985).

In the thirteen remaining states that have created, by decisional law, a cause of action for loss of parental consortium arising from a parent's nonfatal injury, twelve relied, at least in part, on wrongful death statutes allowing children to recover damages for loss of parental consortium.[7] In all of those states, the courts reasoned that allowing such damages under the wrongful death statute was a legislative expression of the state's public policy and that it would be inconsistent with the policy of the state to deny recovery when the parent is not fatally injured. See, e.g., *Hibpshman* v. *Prudhoe Bay Supply, Inc.*, 734 P.2d 991, 994 (Alaska 1987) ("[p]recluding minor children from maintaining a cause of action for loss of parental consortium arising from their parent's injury would . . . be inconsistent with the legislature's authorization of such recovery when the parent dies"); *Villareal* v. *Dept. of Transportation*, 160 Ariz. 474, 479, 774 P.2d 213 (1989) ("[the Arizona] legislature recognizes the value of the parent-child relationship and allows children to recover for the wrongful death of a parent"); *Williams* v. *Hook*, 804 P.2d 1131, 1136–37 (Okla. 1990) ("[W]e are hard pressed to find a distinction between allowing children to recover for loss of consortium a child suffers through the actual death of a parent under [Oklahoma's wrongful death statute] and refusing to allow recovery for the loss of consortium when for all practical purposes the parent is in a state which equates death. . . . In enacting [that statute], the [Oklahoma] [l]egislature has acknowledged that children have a legal entitlement to their parent's society." [Citation omitted; footnotes omitted.]); *Belcher* v. *Goins*, 184 W. Va. 395, 403, 400 S.E.2d 830 (1990) ("the [West Virginia] legislature has implicitly recognized legal entitlement to parent consortium in nonfatal injury cases by explicitly recognizing entitlement to parental consortium in wrongful death cases").

In Connecticut, however, the legislature has not created a cause of action for the loss of parental consortium arising from wrongful death. Connecticut's wrongful death statute allows only a spouse to recover for the postmortem loss of spousal consortium. See General Statutes § 52-555a. If the legislature also had

wanted to allow recovery for the postmortem loss of parental consortium, it certainly could have done so. See, e.g., *Dept. of Public Safety* v. *State Board of Labor Relations*, 296 Conn. 594, 605, 996 A.2d 729 (2010).

After a more searching review of the law in our sister states, it is evident that Wisconsin is the only jurisdiction on which the majority can rely to support its position. Indeed, Wisconsin is the only state that has recognized the claim for loss of parental consortium arising from a parent's nonfatal injury through decisional law without relying on a previous expression of policy by the legislature. See *Theama* v. *Kenosha*, 117 Wis. 2d 508, 527, 344 N.W.2d 513 (1984). As I previously discussed, of the seventeen states that recognize a claim for the loss of parental consortium arising from a nonfatal parental injury, sixteen have done so in reliance on the legislature's expression of the state public policy on parental consortium claims. Accordingly, the majority's statement that the weight of authority no longer supports our decision in *Mendillo* misrepresents the state of the law across the nation.

What is also clear from reviewing decisions from other jurisdictions is that courts are deeply divided over whether public policy favors recognizing a cause of action for the loss of parental consortium. For example, courts have reached different conclusions with respect to whether a child's claim for loss of parental consortium arising from a nonfatal injury will result in double recovery. Compare, e.g., *Borer* v. *American Airlines, Inc.*, 19 Cal. 3d 441, 448, 563 P.2d 858, 138 Cal. Rptr. 302 (1977) ("[d]ifficulty in defining and quantifying damages leads in turn to risk of double recovery: to ask the jury, even under carefully drafted instructions, to distinguish the loss to the mother from her inability to care for her children from the loss to the children from the mother's inability to care for them may be asking too much"), and *Russell* v. *Salem Transportation Co.*, 61 N.J. 502, 507, 295 A.2d 862 (1972) ("[t]he asserted social need for the disputed cause of action may well be qualified, at least in terms of the family as an economic unit, by the practical consideration recognized by many of the cases on the point that reflection of the consequential disadvantages to children of injured parents is frequently found in jury awards to the parents on their own claims under existing law and practice"), with *Hay* v. *Medical Center Hospital*, 145 Vt. 533, 541–42, 496 A.2d 939 (1985) ("The recognition of a separate cause of action on behalf of a minor child . . . will allow juries to properly allocate losses among the separate claims of multiple plaintiffs. We are confident in the ability of . . . trial court judges to give adequate jury instructions concerning the computation and allocation of damages, and of juries to follow such instructions."), and *Nulle* v. *Gillette-Campbell County Joint Powers Fire Board*, 797 P.2d 1171, 1176 (Wyo. 1990) ("The specter of double recovery can be easily eliminated

by the trial court's distinctly specifying in proper jury instructions the respective elements of damages to which the parent and the child are each entitled. We presume the jury reads and follows its instructions.").

Additionally, some courts have dismissed the argument that creating this new claim would result in increased insurance premiums and a societal economic burden. See, e.g., *Berger* v. *Weber*, 411 Mich. 1, 15, 303 N.W.2d 424 (1981) ("[C]ompensating a child who has suffered emotional problems because of the deprivation of a parent's love and affection may provide the child with the means of adjustment to the loss. The child receives the immediate benefit of the compensation, but society will also benefit if the child is able to function without emotional handicap. This may well offset any increase in insurance premiums."); *Ueland* v. *Pengo Hydra-Pull Corp.*, 103 Wn. 2d 131, 140, 691 P.2d 190 (1984) (rejecting argument that recognition of claim would increase insurance rates by stating "[t]his is a standard argument raised against expanding any area of tort liability"). At the same time, other courts have expressed genuine concern over the societal cost of increased litigation, higher insurance premiums, and more individuals forgoing insurance altogether. See, e.g., *Salin* v. *Kloempken*, 322 N.W.2d 736, 741 (Minn. 1982) ("[r]ealistically, the burden of paying damage awards will be borne by the public generally in increased insurance premiums or, alternatively, in the enhanced danger that accrues from the greater number of people who may choose to go without insurance"); *Harrington* v. *Brooks Drugs, Inc.*, supra, 148 N.H. 104 ("The probability of increased litigation and multiple claims, which will hinder settlements and increase expenses, is . . . a concern . . . . In addition, we remain concerned that the social burden of providing damages for this loss will ultimately be borne by the public . . . ." [Citation omitted; internal quotation marks omitted.]). When reasonable minds can differ, as they have in other cases addressing this issue, this court should not impose its will on the public. Instead, it should defer to the legislature, which can fully assess and more accurately weigh the relevant policy considerations.

In light of the foregoing considerations, prudence counsels this court to stay its hand. Instead, the majority's recognition of a cause of action for loss of parental consortium raises more questions than it answers. For example, insurers and defendants are left to wonder where the line between liability and nonliability truly lies. Can grandchildren bring a cause of action for loss of consortium when a grandparent who raises them is injured? Similarly, should liability be permitted when the relationship between a child and his or her noncustodial parent is impaired?[8] Deciding where to draw the line is essentially a political decision that turns on a number of socio-economic factors, and it should there-

fore be left to the legislature. See, e.g., *Borer* v. *American Airlines, Inc.*, supra, 19 Cal. 3d 446–47; *Guenther ex rel. Guenther* v. *Stollberg*, 242 Neb. 415, 419, 495 N.W.2d 286 (1993).

"This uncertainty suggests that the legislature, which can invite public participation in the analysis of all relevant policy considerations and provide clear prospective rules to implement that policy, is better suited than this court to determine the costs and benefits of various liability regimes. . . . Our sympathy for the [children who have lost the love, affection, and society of a parent] . . . should not lead us to usurp the legislature's authority to formulate public policy in this area." *Craig* v. *Driscoll*, 262 Conn. 312, 352–53, 813 A.2d 1003 (2003) (*Sullivan, C. J.*, dissenting). The legislature is better equipped to consider and resolve the competing policy concerns at play. Moreover, if experience proves that the balance between liability and nonliability is not properly struck, the legislature is free to modify the cause of action at any time. Courts, on the other hand, must await a proper case and a "demonstration of error, illogic, or incongruity . . . ." *Norwest* v. *Presbyterian Intercommunity Hospital*, 293 Or. 543, 553, 652 P.2d 318 (1982). Accordingly, as I previously discussed, the question of whether to recognize a claim for the loss of parental consortium arising from a parent's nonfatal injury should be addressed by the legislature, not this court.

Finally, the doctrine of stare decisis dictates that we should follow *Mendillo*, not overturn it.[9] In *State* v. *Salamon*, 287 Conn. 509, 949 A.2d 1092 (2008), Justice Palmer, the author of the majority opinion in the present case, noted: "This court has repeatedly acknowledged the significance of stare decisis to our system of jurisprudence because it gives stability and continuity to our case law. . . . The doctrine of stare decisis counsels that a court should not overrule its earlier decisions unless the most cogent reasons and inescapable logic require it. . . . Stare decisis is justified because it allows for predictability in the ordering of conduct, it promotes the necessary perception that the law is relatively unchanging, it saves resources and it promotes judicial efficiency. . . . It is the most important application of a theory of decisionmaking consistency in our legal culture and . . . is an obvious manifestation of the notion that decisionmaking consistency itself has normative value." (Citation omitted; internal quotation marks omitted.) Id., 519. "The doctrine of stare decisis protects the legitimate expectations of those who live under the law, and . . . is one of the means by which exercise of an arbitrary discretion in the courts is restrained." (Citation omitted; internal quotation marks omitted.) *Hubbard* v. *United States*, 514 U.S. 695, 716, 115 S. Ct. 1754, 131 L. Ed. 2d 779 (1995) (Scalia, J., concurring in part and concurring in the judgment). We also have recognized that this court will overrule a

previous decision when it is clearly wrong. See, e.g., *State* v. *Miranda*, 274 Conn. 727, 734, 878 A.2d 1118 (2005).[10]

The majority fails to explain why "the most cogent reasons and inescapable logic require" that we overturn *Mendillo*; *State* v. *Salamon*, supra, 287 Conn. 519; or why it simply believes that *Mendillo* was wrongly decided. In overruling this court's holding in *Mendillo*, the majority destroys any semblance of stability in this area of the law. For instance, insurers now cannot be sure whether this court will further extend this cause of action to stepchildren, a question the majority expressly leaves unresolved, or other family members. To account for this uncertainty, insurers may raise premiums for *all* insureds, which would be a rational response to the unpredictability the majority has introduced into this area of the law by overruling *Mendillo*, a case under which insurers and insureds have operated for nearly twenty years.

In sum, the question of whether to overturn *Mendillo* and create a cause of action for the loss of parental consortium rests on policy considerations that only the legislature properly can evaluate. Moreover, the majority of other states that have addressed this issue have declined, as we did in *Mendillo*, to recognize such a cause of action. This court will now be only the second state supreme court in the country to recognize this cause of action in the absence of any legislative pronouncement supporting its creation. Finally, the principle of stare decisis dictates that we should adhere to our holding in *Mendillo*. In overruling *Mendillo*, rather than deferring to the legislature, the majority casts a shadow of doubt over when and to what extent this court will further expand the scope of loss of consortium claims.

For the foregoing reasons, I respectfully dissent.

[1] The traditional nuclear family has become a minority in America. In fact, presently, only 20 percent of households would be considered traditional or nuclear families, that is, a husband and wife plus children. See J. Walter Thompson Intelligence, "Meet the New Family" (September, 2014) pp. 6–7, available at https://d3ftitl17j4lal.cloudfront.net/b49a88b0-5573-4347-80e8-55300923190f-all documents.pdf (last visited September 21, 2015). Among the alternative family forms are cohabiting couples, same-sex couples, single parent households, and extended family (or multigenerational) households. See J. Merrill, note, "Two Steps Behind: The Law's Struggle To Keep Pace with the Changing Dynamics of the American Family," 2009 Utah L. Rev. 557, 558. These changing family structures make weighing public policies regarding family concerns more difficult than ever, and such issues should be left to the elected branches of government.

[2] I acknowledge that the plaintiffs argue that the cause of action for loss of parental consortium should include damages arising from their father's injuries sustained prior to his death and damages arising from his death. However, that does not change the fact that the two causes of action cannot be conflated. The majority rightly concludes that we cannot allow the latter claim, and, therefore, I am concerned only with the former.

[3] See Fla. Stat. Ann. § 768.0415 (West 2011); Iowa Code Ann. § 613.15 (West 1999); La. Civ. Code Ann. art. 2315 (B) (2008); R.I. Gen. Laws § 9-1-41 (b) (2012); *Hibpshman* v. *Prudhoe Bay Supply, Inc.*, 734 P.2d 991, 997 (Alaska 1987); *Villareal* v. *Dept. of Transportation*, 160 Ariz. 474, 477, 774 P.2d 213 (1989); *Ferriter* v. *Daniel O'Connell's Sons, Inc.*, 381 Mass. 507,

516, 413 N.E.2d 690 (1980); *Berger* v. *Weber*, 411 Mich. 1, 13, 17, 303 N.W.2d 424 (1981); *Pence* v. *Fox*, 248 Mont. 521, 527, 813 P.2d 429 (1991); *Gallimore* v. *Children's Hospital Medical Center*, 67 Ohio St. 3d 244, 255, 617 N.E.2d 1052 (1993); *Williams* v. *Hook*, 804 P.2d 1131, 1138 (Okla. 1990); *Reagan* v. *Vaughn*, 804 S.W.2d 463, 467 (Tex. 1990), modified on other grounds, Texas Supreme Court, Docket No. C-9548 (Tex. March 6, 1991); *Hay* v. *Medical Center Hospital*, 145 Vt. 533, 545, 496 A.2d 939 (1985); *Ueland* v. *Pengo Hydra-Pull Corp.*, 103 Wn. 2d 131, 140, 691 P.2d 190 (1984); *Belcher* v. *Goins*, 184 W. Va. 395, 406, 400 S.E.2d 830 (1990); *Theama* v. *Kenosha*, 117 Wis. 2d 508, 527, 344 N.W.2d 513 (1984); *Nulle* v. *Gillette-Campbell County Joint Powers Fire Board*, 797 P.2d 1171, 1176 (Wyo. 1990).

The majority notes that twenty jurisdictions recognize the cause of action that it creates today. I do not agree with its characterization of the law in Minnesota, New Mexico, and South Dakota.

The majority cites *Lefto* v. *Hoggsbreath Enterprises*, *Inc.*, 567 N.W.2d 746 (Minn. App. 1997), aff'd, 581 N.W.2d 855 (Minn. 1998), to support its claim that Minnesota recognizes a limited loss of parental consortium claim. In *Lefto*, however, the Minnesota Supreme Court, which affirmed the decision of the Minnesota Court of Appeals, did not determine that the child could assert a claim for loss of parental consortium. See *Lefto* v. *Hoggsbreath Enterprises*, *Inc.*, 581 N.W.2d 855, 857–58 (Minn. 1998). Instead, that court interpreted Minnesota's dram shop law and concluded that the child in question could recover damages under *that law* for injuries the defendant caused to her mother's fiance, with whom the mother and her daughter had been cohabiting. Id., 856–58. The majority cannot seriously contend that allowing recovery under a dram shop law is the same as recognizing a cause of action for loss of parental consortium, even if it only claims that it is a similar cause of action. Moreover, the Minnesota Supreme Court previously had *expressly rejected* a claim for loss of parental consortium. *Salin* v. *Kloempken*, 322 N.W.2d 736, 742 (Minn. 1982) ("[w]e conclude . . . that . . . a new cause of action on behalf of a child for the loss of parental consortium should not be recognized").

Similarly, the majority cites a case decided by the New Mexico Court of Appeals, *Brenneman* v. *Board of Regents*, 135 N.M. 68, 84 P.3d 685 (App.), cert. denied, 135 N.M. 51, 84 P.3d 668 (2003). In *Brenneman*, as in the *Lefto* case in Minnesota, the court was interpreting an unrelated statute, namely, New Mexico's Tort Claims Act. See id., 69. The court in *Brenneman* concluded: "The plain language of the [Tort Claims] Act, [the] cases interpreting it, and its legislative history all indicate that loss of consortium damages should be recoverable [there]under . . . ." Id., 72. That case says nothing about allowing claims for loss of parental consortium that are brought independently of the New Mexico Tort Claims Act. At best, it can be said that the law in New Mexico is unclear; it certainly cannot be argued that New Mexico has generally recognized a cause of action for the loss of parental consortium.

With respect to South Dakota, the majority cites *Zoss* v. *Dakota Truck Underwriters*, 590 N.W.2d 911 (S.D. 1999), a wrongful death case. See id., 912. The majority is correct that South Dakota allows a child to "recover [the] pecuniary value of [the] loss of society and companionship [of the parent], which includes such things as protection, guidance, advice and assistance . . . ." Footnote 9 of the majority opinion, quoting *Zoss* v. *Dakota Truck Underwriters*, supra, 914. The point the majority fails to understand, however, is that such recovery is limited to cases involving the *wrongful death* of the parent. See *Zoss* v. *Dakota Truck Underwriters*, supra, 914. In fact, the court in *Zoss* seemed to suggest that there is no claim for loss of parental consortium when it defined consortium as "a right growing out of the marital relationship . . . ." (Internal quotation marks omitted.) Id. Although I cannot say with certainty that South Dakota has rejected a cause of action for loss of parental consortium arising out of a parent's nonfatal injury, the majority certainly cannot claim that it has recognized such a cause of action or a similar cause of action.

[4] See *Patterson* v. *Hays*, 623 So. 2d 1142, 1146 (Ala. 1993); *Lewis* v. *Rowland*, 287 Ark. 474, 478–79, 701 S.W.2d 122 (1985); *Borer* v. *American Airlines*, *Inc.*, 19 Cal. 3d 441, 451, 453, 563 P.2d 858, 138 Cal. Rptr. 302 (1977); *Lee* v. *Dept. of Health*, 718 P.2d 221, 233–34 (Colo. 1986); *Mendillo* v. *Board of Education*, supra, 246 Conn. 461, 477; *Washington* v. *Washington Hospital Center*, 579 A.2d 177, 179 n.1 (D.C. 1990); *W.J. Bremer Co.* v. *Graham*, 169 Ga. App. 115, 116–17, 312 S.E.2d 806 (1983), cert. denied, 252 Ga. 36, 312 S.E.2d 787 (1984); *Halberg* v. *Young*, 41 Haw. 634, 646 (1957); *Green* v. *A. B. Hagglund & Soner*, 634 F. Supp. 790, 796–97 (D. Idaho 1986);

*Karagiannakos* v. *Gruber*, 274 Ill. App. 3d 155, 158, 653 N.E.2d 932, appeal denied, 164 Ill. 2d 565, 660 N.E.2d 1271 (1995); *Dearborn Fabricating & Engineering Corp.* v. *Wickham*, 551 N.E.2d 1135, 1139 (Ind. 1990); *Klaus* v. *Fox Valleny Systems, Inc.*, 259 Kan. 522, 531, 912 P.2d 703 (1996); *Lambert* v. *Franklin Real Estate Co.*, 37 S.W.3d 770, 780 (Ky. App. 2000); *Durepo* v. *Fishman*, 533 A.2d 264, 264–66 (Me. 1987); *Gaver* v. *Harrant*, 316 Md. 17, 32–33, 557 A.2d 210 (1989); *Salin* v. *Kloempken*, 322 N.W.2d 736, 742 (Minn. 1982); *Thompson* v. *Love*, 661 So. 2d 1131, 1135 (Miss. 1995); *Powell* v. *American Motors Corp.*, 834 S.W.2d 184, 191 (Mo. 1992); *Guenther ex rel. Guenther* v. *Stollberg*, 242 Neb. 415, 421, 495 N.W.2d 286 (1993); *General Electric Co.* v. *Bush*, 88 Nev. 360, 368, 498 P.2d 366 (1972); *Harrington* v. *Brooks Drugs, Inc.*, 148 N.H. 101, 104, 808 A.2d 532 (2002); *Russell* v. *Salem Transportation Co.*, 61 N.J. 502, 504, 506, 295 A.2d 862 (1972); *DeAngelis* v. *Lutheran Medical Center*, 58 N.Y.2d 1053, 1055, 449 N.E.2d 406, 462 N.Y.S.2d 626 (1983); *Vaughn* v. *Clarkson*, 324 N.C. 108, 111, 376 S.E.2d 236 (1989); *Hastings* v. *James River Aerie No. 2337-Fraternal Order of Eagles*, 246 N.W.2d 747, 753 (N.D. 1976); *Norwest* v. *Presbyterian Intercommunity Hospital*, 293 Or. 543, 563, 567, 652 P.2d 318 (1982); *Steiner ex rel. Steiner* v. *Bell Telephone Co.*, 358 Pa. Super. 505, 522, 517 A.2d 1348 (1986), aff'd, 518 Pa. 57, 540 A.2d 266 (1988); *Taylor* v. *Medenica*, 324 S.C. 200, 222, 479 S.E.2d 35 (1996); *Taylor* v. *Beard*, 104 S.W.3d 507, 511 (Tenn. 2003).

The majority cites a case from the United States District Court for the District of Hawaii, namely, *Marquardt* v. *United Airlines, Inc.*, 781 F. Supp. 1487 (D. Haw. 1992); see footnote 11 of the majority opinion; which surmises that the Hawaii Supreme Court would overrule its earlier decision declining to recognize a cause of action for the loss of parental consortium. See *Marquardt* v. *United Airlines, Inc.*, supra, 1492. Until the Hawaii Supreme Court does so, however, the law in Hawaii is that no such cause of action exists.

[5] I, like the majority, have not found any cases or statutes concerning this issue in Delaware, Utah, or Virginia, and, for the reasons I stated in footnote 3 of this opinion, I find the law in New Mexico and South Dakota to be unclear.

[6] See Fla. Stat. Ann. § 768.0415 (West 2011); La. Civ. Code Ann. art. 2315 (B) (2008); R.I. Gen. Laws § 9-1-41 (b) (2012); see also Iowa Code Ann. § 613.15 (West 1999) (allowing for recovery of lost value of services and support of injured parent, but claim belongs to injured parent, not child).

The Iowa Supreme Court has declined to recognize a cause of action for loss of parental consortium that can be brought independently by the child. See *Audubon-Exira Ready Mix, Inc.* v. *Illinois Central Gulf Railroad Co.*, 335 N.W.2d 148, 152 (Iowa 1983). Instead, Iowa allows the injured parent to recover for the lost value of services and support that the injured parent would have provided to the child but for the injury. See Iowa Code Ann. § 613.15 (West 1999).

[7] See *Hibpshman* v. *Prudhoe Bay Supply, Inc.*, 734 P.2d 991, 994 (Alaska 1987); *Villareal* v. *Dept. of Transportation*, 160 Ariz. 474, 479, 774 P.2d 213 (1989); *Ferriter* v. *Daniel O'Connell's Sons, Inc.*, 381 Mass. 507, 515, 413 N.E.2d 690 (1980); *Berger* v. *Weber*, 411 Mich. 1, 13, 303 N.W.2d 424 (1981); *Pence* v. *Fox*, 248 Mont. 521, 526–27, 813 P.2d 429 (1991); *Gallimore* v. *Children's Hospital Medical Center*, supra, 67 Ohio St. 3d 250–51; *Williams* v. *Hook*, 804 P.2d 1131, 1136 (Okla. 1990); *Reagan* v. *Vaughn*, 804 S.W.2d 463, 465 (Tex. 1990), modified on other grounds, Texas Supreme Court, Docket No. C-9548 (Tex. March 6, 1991); *Hay* v. *Medical Center Hospital*, 145 Vt. 533, 537, 496 A.2d 939 (1985); *Ueland* v. *Pengo Hydra-Pull Corp.*, 103 Wn. 2d 131, 134, 691 P.2d 190 (1984); *Belcher* v. *Goins*, 184 W. Va. 395, 403, 400 S.E.2d 830 (1990); *Nulle* v. *Gillette-Campbell County Joint Powers Fire Board*, 797 P.2d 1171, 1172 (1990).

[8] These are but two examples of similar relationships for which liability under the majority's newly created cause of action could ultimately exist. Other possibilities include aunts and uncles and nieces and nephews, step-parents and stepchildren, foster parents and foster children, and siblings, to name only a few more. In each of these relationships, it is conceivable that the adult, although not the child's natural or legal parent, stands in loco parentis.

[9] The majority pays mere lip service to the principle of stare decisis, claiming that it may properly overrule *Mendillo* because, in *Hopson* v. *St. Mary's Hospital*, 176 Conn. 485, 494–96, 408 A.2d 260 (1979), we overruled our earlier decision in *Marri* v. *Stamford Street Railroad Co.*, 84 Conn. 9, 23–24, 78 A. 582 (1911), in which we declined to recognize a claim for loss of spousal consortium. See footnote 16 of the majority opinion. The only commonality between this case and *Hopson*, however, is that they both deal

with consortium claims. In *Hopson*, this court concluded that its decision and reasoning in *Marri* were no longer persuasive because "a growing majority of courts have come to recognize a right of action for loss of consortium in either spouse. . . . The right of a husband to bring an action for loss of consortium has long been acknowledged in a substantial majority of the jurisdictions. The right of the wife . . . has now been recognized in many jurisdictions." (Citation omitted; footnote omitted.) *Hopson* v. *St. Mary's Hospital*, supra, 495. The conditions that existed in *Hopson*, however, do not exist in the present case. As I discussed previously, the majority of jurisdictions decline to recognize a claim for loss of parental consortium, and, since our decision in *Mendillo*, no state has recognized such a claim. Therefore, the logic that compelled the court in *Hopson* to overrule *Marri* does not compel this court to overrule *Mendillo* in the present case.

[10] The majority does not contend that our holding in *Mendillo* was *clearly* wrong, nor could it. Indeed, *Mendillo* could not clearly have been wrong because, when it was decided, more than one half of our sister states had expressly declined to recognize a cause of action for loss of parental consortium. See *Mendillo* v. *Board of Education*, supra, 246 Conn. 490–91. Moreover, if *Mendillo* was clearly wrong, then, surely, the legislature would have taken some action in the seventeen years since it was decided. For instance, when this court decided in *Craig* v. *Driscoll*, supra, 262 Conn. 339–40, that the state's Dram Shop Act did not preclude a common-law negligence action against a purveyor of alcoholic beverages that serves liquor to an intoxicated patron who subsequently injures a third party, the legislature took only about four months to effectively overrule this court's holding in that case. See Public Acts 2003, No. 03-91, § 1.